Conrad GERDES, Plaintiff,

v.

Delores V. GERDES, Citizens Federal Savings & Loan Association, Madison Aviation, A.E. Spears Service, Winters National Bank & Trust Company, Defendants.

In the Matter of Conrad GERDES, Debtor.

Adv. No. 3–83–0389.
Bankruptcy No. 3–83–01105.

United States Bankruptcy Court, S.D. Ohio, W.D.

Sept. 23, 1983.

Thomas R. Noland, Dayton, Ohio, for plaintiff/debtor.

Frank M. Root, Dayton, Ohio, for defendant Delores V. Gerdes.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### PRELIMINARY PROCEDURE

This matter is before the Court upon "Complaint to Sell Real Estate Free and

Clear of Liens" filed by Debtor on 6 June 1983. A pretrial order was entered conformably to a pretrial conference held 21 July 1983, and the Court heard the matter at a trial held 25 August 1983. The following decision is based upon the evidence adduced at the hearing, inclusive of uncontested facts incorporated in the joint pretrial order approved by the Court on 20 August 1983, and the record.

## FINDINGS OF FACT

On 19 March 1979, Debtor and Defendant Delores V. Gerdes, Debtor's ex-wife, entered into a Separation Agreement whereby Debtor and his ex-wife each obtained as a part of a complicated property settlement an undivided one-half interest in the subject real property, known as the Brookville Airport or Airpark, as tenants in common. In pertinent part, the Separation Agreement also required Debtor to pay alimony to his ex-wife, as follows:

17. ALIMONY [A]. The Husband shall pay Wife, as and for alimony the sum of One Thousand Three Hundred Dollars ($1,300.00) per month for a twenty-year period. This amount shall be increased Sixty-five Dollars ($65.00) per month on each anniversary date hereafter. Said alimony shall be reduced each month by any payments made to Wife over and above her share of the mortgage payments on the leased real estate under leases with Brookville Airpark and Western Aviation. In the event the Wife's interest in the Brookville Airpark or Western Aviation is voluntarily sold, each alimony shall be reduced by the amount of the lease payment which she is to receive over and above her share of the mortgage payment. A voluntary sale, for purposes of this agreement, shall be any sale, other than a sale by judicial process.

B. Husband shall pay wife as alimony the sum of One Thousand Two Hundred Seventy-eight and 21/100 Dollars ($1,778.21) per month. Any payments to Citizens Federal made on the Brookville Airpark mortgage by the Husband or any amounts received by Wife by virtue of a certain lease with Brookville Airpark over and above the ten-thirteenths of the alimony set forth in Item A shall be a credit on this amount. Said alimony shall terminate upon the sale of the Brookville Airpark or the payment in full of the Citizens Federal mortgage.

C. Husband shall pay wife as alimony the sum of One Thousand Four Hundred Ninety-one Dollars ($1,491.00) per month. Any payments to Garber made on the Dahio Airpark mortgage by the Husband, or any amounts received by Wife by virtue of a certain lease with Western Aviation over and above the three-thirteenths of the alimony set forth in Item A shall be a credit on the amount. Said alimony shall terminate upon the sale of the Dahio Airpark or the payment in full of the Garber Mortgage. Wife agrees to join in refinancing mortgage at the end of ten years, if mortgage is current.

D. It is agreed and understood that all of the above payments shall be secured by a second mortgage on the husband's interest in the real estate occupied by Brookville Airport and Dahio Airport in the amount of Four Hundred Thousand Dollars ($400,000.00) which represents in the aggregate his alimony payments due hereunder.

E. Husband shall pay wife as and for permanent alimony, the sum of Fifteen Thousand Dollars ($15,000.00). This obligation may be discharged by the payments to the New Lebanon Bank of Fifteen Thousand Dollars ($15,000.00 due on a note secured by receivables of Western Aviation or by the release of the Wife on said note.

F. Husband agrees to pay or cause to pay the following obligations, and save the Wife harmless therefrom:

1. To The Florida Bank of Commerce a Fifty Thousand Dollars ($50,000.00) obligation secured by aircraft at Brookville Airpark.

2. A Twelve Thousand Five Hundred Dollar ($12,500.00) obligation secured by wrecked aircraft at Brookville Airpark.

Also pertinent to the decision herein, the Agreement further provides, in relevant part, (in another section designated as 17) as follows:

17. Husband agrees to pay One Thousand One Hundred Dollars ($1,100.00) of the existing Master Charge indebtedness at the Ohio State Bank.

18. Husband shall pay to wife the sum of Thirty-five Thousand Dollars ($35,-000.00). This obligation may be discharged by payment to Estell Spears of a certain note which represents the purchase of his interest at Dahio Airport, provided, however, that upon the sale of the Dahio Airport real estate, Husband shall receive the first Twenty Thousand Dollars ($20,000.00) of equity in the property, if any.

19. It is agreed and understood that each party hereto shall assume one-half of the liability on the following debt. A Ten Thousand Dollar ($10,000.00) note to the New Lebanon Bank.

20. Wife agrees to name the children of the parties, share and share alike, as beneficiaries of Lutheran Brotherhood Life Insurance Policy No. 1435919 in the face amount of Fifteen Thousand Dollars ($15,000.00) and policy No. 1627842 in the face amount of Twenty-two Thousand Seven Hundred Fifteen Dollars ($22,-715.00), and Husband agrees to pay the premium thereon in the amount of Three Hundred Twenty-four and 40/100 Dollars ($324.40) on Policy No. 1435919, and Policy No. 1627842 in the amount of Five Hundred Fifty-four Dollars ($554.00). Wife shall retain as and for her own security, the other life insurance policies in the face amount of Twenty-two Thousand Six Hundred Dollars ($22,600.00), which are presently held in her name.

Wife upon written request of the Husband, shall assign ownership of the policies where she has agreed to name the children beneficiaries.

The Separation Agreement became effective upon incorporation in and issuance on 26 March 1979 of a Judgment and Final Decree of Divorce by the Common Pleas Court of Montgomery County Ohio, Division of Domestic Relations, in case number 78–DR–2042.

The monetary amounts to be paid and the leases referred to in the Separation Agreement were negotiated on the basis of an "Affidavit of Income and Expenses" required by and filed in the state Domestic Relations Court as a standard procedure required by that Court and by consideration of the needs of Defendant herein for immediate support and maintenance funds and real estate mortgage installment payments for which she was jointly liable with Plaintiff herein. The 20-year end limitation contemplated that Defendant would be eligible for social security payments if an acceptable buyer for the premises could not be obtained. She was approximately 40 years of age upon their separation, and had received a high school education.

The parties at the time of the marriage brought no individual assets to the union. The Debtor had achieved marked success in the aircraft business, and was duly licensed to operate certain aspects of the airport businesses for which the proposed buyer is not qualified. The buyer would employ Debtor if the sale is consummated to operate the included ongoing flight school and the charter airplane business. The income from these operations is the principal potential for the future success of the airpark being sold and the Plaintiff Debtor would receive undisclosed compensation after the sale.

The proposed sale would not realize sufficient cash funds to pay for Defendant's undivided interest as tenant in common. As the total purchase consideration is only $60,000.00 in cash and the assumption of the existing first mortgage, the wife would in effect be required to finance a portion of the purchase. There is no evidence adduced that she would be released of her existing liability on the mortgage assumed. The Sale Agreement also stipulates "Conrad Gerdes to hold a second mortgage on balance at 10% interest amortized over 20 years to balloon in 10 years."

On 21 March 1979, Debtor's ex-wife duly recorded the mortgage securing her alimony rights as created in ¶ 17(D) of the Separation Agreement. It is undisputed that the mortgage contains an accurate and sufficient legal description of the subject Brookville Airport and also of a second "airport," known as the Dahio Airport which is also equally and jointly owned by Debtor and his ex-wife pursuant to the Separation Agreement. The mortgage lien was requested by the Defendant and granted because the alimony funded by lease payments would put her at the mercy of a business to which she had surrendered her interest.

On 9 May 1983, Debtor filed a Petition under 11 U.S.C. Chapter 11. Debtor duly scheduled his one-half interest in the subject airport and his ex-wife's lien thereon.

On 6 June 1983, Debtor filed the instant Complaint requesting that the Court order sale of the entire Brookville Airport pursuant to 11 U.S.C. § 363(h). Debtor also requests that this Court determine that the obligations incurred by Debtor in paragraphs 17 (presumably both paragraphs 17), 18, 19, and 20 of the Separation Agreement are not in the nature of alimony, maintenance or support, and therefore are not excepted from discharge under 11 U.S.C. § 523(a)(5) or otherwise.

The parties agree that the value of the subject Airport is greater as a going concern, and also that partition of the property, even if possible, would reduce the aggregate value of the property. The instant Complaint was prompted by Defendant's refusal to consent to the proposed sale of the Airport to a third-party buyer now *sub judice.* The sale, arranged by Debtor, provided for sale of the parties' Brookville Airpark real estate for $230,000.00 and bulk sale of the airpark's inventory, goodwill and receivables, (in the name of a wholly owned corporation known as Brookville Airpark, Inc.) for $177,000.00. Debtor contends that the aggregate sale price of $407,000.00 is reasonable, and that the allocation of $177,000.00 to "his" non-realty business is fair. The third party's offer to purchase the Air-

park, by its own terms, remained open until 31 May 1981. Debtor has indicated that the agreement nevertheless has remained open by consent of the purchaser.

Debtor's ex-wife, however, contends that the aggregate value of the Airpark is much higher than the amount of the offer to purchase, and also that the sale arrangement allocates too much of the aggregate sale price to the personalty and goodwill.

Debtor's ex-wife submitted expert testimony that the value of the real estate and fixtures is at least $584,000.00. Also, capitalizing the present earnings at an arbitrary 10% rate would render a computed valuation of $310,000.00.

The Debtor had never obtained an appraisal of the property by a professional appraiser before negotiating for a sale and had never obtained bids from any other purchasers before negotiating a sale contract with the offeror now involved. By accepting the offer submitted by the agent of the purchaser, he agreed to pay "a fee for professional real estate services" in the amount of $13,800.00 upon delivery of a deed.

Conrad Gerdes and Delores V. Gerdes were married on June 25, 1955, while the parties were still in high school. Four children were born as issue of the marriage, one of whom was a minor seventeen years of age at the time of the divorce.

At the time of the divorce, and for many years preceding, Conrad Gerdes had been operating Airparks in the name of corporations known as Brookville Airpark, Inc., and Western Aviation, Inc., on real estate located in Brookville and property known as the Dahio Airport in western Montgomery County, Ohio.

Delores had been employed as homemaker during the entire span of the marriage relationship, rearing four children issue of the marriage and only occasionally assisting in the family enterprises in an unskilled capacity as she has no particular business training or skill. Since the divorce decree she has recently undertaken employment as a real estate sales person. On March 19,

1979, the same date that the Separation Agreement was executed by the parties, Brookville Airpark, Inc., a corporation solely owned by Conrad Gerdes, executed a lease with the owners of the real estate, Conrad Gerdes and Delores V. Gerdes. Simultaneously, another lease was executed by Western Aviation Inc., an Ohio Corporation also owned by Conrad Gerdes, with the lessors, Conrad and Delores V. Gerdes, for the property known as Dahio Air Park Inc. Previously the real property had been conveyed to Conrad and Delores Gerdes in connection with the execution of the Separation Agreement and a mortgage was granted by Conrad Gerdes to Delores Gerdes in the amount of $468,000.00. Payments made by the airparks upon the leases were used to pay real estate mortgages and the balance to Defendant pursuant to the Separation Agreement. From April 15, 1979, through March 19, 1980 the total of $15,600.00 was paid to the account of the Defendant; $16,433.00 was paid from April 1, 1980 through March 19, 1981; and $10,093.11 was paid from April 11, 1981, to December 21, 1981. Thereafter, no further payments have been made to Defendant.

In February, 1983 Plaintiff began negotiations with Clyde Mullins for the sale of the Brookville Airpark, which included both the real estate and the corporate business assets then owned by Plaintiff conformably to the divorce decree. The valuation assigned in the first offer for the real estate portion was in the amount of $250,000.00, which was rejected by Delores Gerdes. The proposed sale included a tentative agreement that Mr. Gerdes would provide his services in operating charter services and the flight school because the prospective purchaser was not and could not be duly licensed for this type of business. After the original offer was rejected, a subsequent offer for the purchase of the real estate and the business provided that the purchase price for the real estate would be only $230,000.00 and the purchase price for the business assets of the corporation would be $177,000.00, which included the rights to the contracts acquired through Brookville Air Park as to the charter service and training

school and also a covenant not to compete on the part of Conrad Gerdes. Both offers were contingent upon the purchaser obtaining the title to both the real estate and the business assets. Defendant, Delores Gerdes, again refused to sign the contract, as it was for an even smaller purchase price as to the real estate.

The evidence adduced demonstrates that the Plaintiff had never had the property appraised by a professional appraiser and that he conducted no negotiations with any prospective purchasers other than Mullins.

Defendant had employed a professional real estate appraiser who rendered an expert opinion based upon a cost approach and a market data approach. A physical inspection of the premises by the appraiser indicated that the property was not divisible and subject to physical partition. A reasonable valuation based upon the cost approach was fixed at $683,000.00 and on the market data approach at $584,000.00. By capitalizing the current income from the existing lease at a nominal rate of 10%, the capitalization value would be $310,000.00. The current market value as fixed by such appraisal was made with the realization that the property is a special purpose facility used as a commercial airport and that many of the improvements, such as a swimming pool, tennis courts, etc., were in dire need of rehabilitation.

Both of the attorneys for the respective parties at the time of the preparation of the Separation Agreement and subsequent divorce decree testified as to the purpose and intent of the various provisions incorporated into the Separation Agreement, as executed by the parties. A superficial analysis of the testimony of the attorneys might be construed to conclude that neither of the attorneys completely understood each other. This inconsistency is more apparent than real, however. Both attorneys are obviously correct and consistent, but with different perspectives. From the testimony of the attorneys and a careful examination of the entire agreement, the major intention was obviously to effect a fair division of the marital property. Such a thread runs

throughout the four corners of the document. Nevertheless, all the parties concurred that the Defendant would not have the wherewithall for proper support and maintenance until the property division had been finalized and all of the property had been liquidated. All of the parties were basically consistent in the belief that a least $1,300.00 per month from the subject airport, and payment of an existing mortgage, must be provided for Defendant until the property could be sold or the mortgage paid. It was the obvious intention of the parties to provide the Defendant proper maintenance and support until liquid assets were available. The intention was to provide "alimony" to the wife until a fair market value could be obtained for the property as incorporated into the disputed section 17 of the Separation Agreement. As soon as such a sale could be consummated, alimony would cease and the mortgage securing same would be satisfied.

It was the hope and anticipation of all parties that the lease revenues for the airport properties would provide the funding for the provisional support and maintenance payments. Since the Plaintiff's husband received as his *aliquot* share of the property division all income-producing businesses (the airports) this item of income was also tied into the income anticipated from the lease payments. Any deficiency from the lease payments as a source of the alimony were guaranteed from the business income. The basic liability for the payments were to be guaranteed by the husband as alimony and the lease payments were so devised as to obtain what was supposed to be a tax advantage to the Defendant and to satisfy the income and expense requirements of the state court.

Subsequent economic conditions have demonstrated that the unappraised book valuations assumed by the parties for the assets as divided did not convert into realistic market values. The wife did not realize the largesse contemplated upon liquidation; and, the business from the airport has not been sufficient to carry the economic burdens until the property could be sold or refinanced and thereby liquidate the defendant wife's undivided ½ interest.

It is now obvious that it is in the best interest of both Plaintiff and Defendant conscientiously to endeavor to find a satisfactory buyer of the property at its market value because a forced sale and a foreclosure proceedings would defeat both their respective interests both as temporary alimony and as a division of the property.

DECISION

Basically two causes of action are the subject of the Complaint herein.

The Plaintiff seeks Court approval as co-owner with Defendant to sell the entire interest of both parties in certain real estate in accordance with the terms and conditions of a contract negotiated and executed by Plaintiff, pursuant to the provisions of 11 U.S.C. § 363. The second cause of action requests a determination by the court as to whether the provisions of a Separation Agreement executed by the parties on 19 March 1979 and incorporated into a divorce decree subsequently rendered to the parties is in fact alimony and not dischargeable as in the nature of maintenance or support, or whether the agreement and decree should be interpreted as a "division of property" or "property settlement."

As delineated in the Pretrial Order, there is another fundamental question to be resolved in the interpretation of the provisions of 11 U.S.C. § 363(h) which has been phrased, as follows:

May an order of sale of the real estate free of the interest of Defendant, absent her consent, be ordered where defendant involuntarily will be required to look to a third party with whom she has not negotiated or accepted any offer for payment from the unpaid portion of the purchase price, and whether the court may, or should, in fact extinguish her mortgage "in a manner similar to that which Courts extinguish mortgages in foreclosure proceedings"?

Of course, the statute itself specifically requires a determination by the court as to whether the benefit to the estate of the

proposed sale free of the interest of the Defendant outweighs the detriment, if any, to Plaintiff.

## I

Both parties have very well catalogued the factors previously considered by this Court (and numerous other courts) in rationalizing the statutory dichotomy between "alimony and support" and a pure "division of property." Even though these often cited factors to a marked degree merely provide grounds for begging the question, their limited usefulness will be applied *instanter,* with special emphasis upon the instant fact situation and the pertinent factors, as cited by Plaintiff, namely: the express terms of the Separation Agreement, when the obligation ceases, probable need and economic position of wife after divorce, and the history of the marriage and financial resources available for placing the parties in tenable position for basic living conditions. See the Decision by the United States Court of Appeals for the Sixth Circuit *In Re Clarence Oral Calhoun,* 1983, 715 F.2d 1103 for a digest of these factors, to be applied herein. Footnote 7 from Page 1108 reads, as follows:

> The nature of the obligations assumed (provision of daily necessities indicates support); the structure and language of the parties' agreement or the court's decree; whether other lump sum or periodic payments were also provided; length of the marriage; the existence of children from the marriage; relative earning powers of the parties; age, health and work skills of the parties; the adequacy of support absent the debt assumption; and evidence of negotiation or other understandings as to the intended purpose of the assumption.

The primary determination in all such dischargeability cases is to fathom and determine the intention of the parties. This determination in the case *sub judice* involves an analysis of the facts and somewhat conflicting testimony of the attorneys for the respective parties in drafting the Separation Agreement, and the unequivocal use of the word "alimony" to describe the Agreement at issue. It is interesting to note that in behalf of the Plaintiff Husband it is urged that the use of this very specific term was intended as a collusive device to assist his wife in avoiding the payment of federal taxes, so that his wife could derive the maximum benefit therefrom. The evidence is clear, however, that the lease payments required from the Plaintiff's use of the premises for the business he acquired in the clear division of property provisions of the agreement were based in great part upon what the divorced wife would require for continual support and maintenance requirements. Hence, even though the subterfuge to defeat a proper liability for payment of federal taxes is entirely creditable, such subterfuge is hardly a firm basis at this late date for a determination by a court that the parties did not really mean what they expressed in words. Consequently and fortunately the true intention of the parties at the time of the execution of the controversial Separation Agreement can be very well determined by the very terms of the agreement and the circumstances of the respective parties at the time of its execution.

The evidence is clear and convincing, however, that the disputed award to the wife in section 17 of the Agreement, in light of the totality of the other provisions of the Agreement, was intended only as provisional and in the nature of temporary support until a final property division and settlement could be consummated. There is no question that the Defendant-Wife was in dire need of current cash income until the final division of property had been accomplished. The conclusion is also inescapable that so long as the lease payments under the necessary and support maintenance requirements were made that the personal liability of Plaintiff was to be only contingent, as supplementary of the lease payments. The use of the word "alimony" reinforces the conclusion that the Defendant was to receive necessary monthly cash payments, which was confirmed by the testimony of the attorney of Plaintiff. Regardless of how the funding was derived, in

any event, it was thus Plaintiff's obligation to make or assure the payments. The payments would be due and owing until the property was sold, with an end limitation of twenty-years if not sold by consent of both parties.

Even though the payments via the wholly owned corporation of Plaintiff may not strictly speaking constitute alimony payments from Plaintiff, the Plaintiff's guarantee of the payments does. Such is exactly what the agreement provides. The amounts to be paid via the wholly owned corporation were negotiated and established from the income and expense statement required by the state court for the acknowledged purpose of establishing the need and monetary amounts of the support.

As a tenant in common of the real estate by the property settlement, the Defendant was already entitled to one-half of the lease income. Hence, the reason for adding an "alimony" obligation was to substantiate her right to look to her ex-husband for provisional support and to assure her means of support in case of the failure of the corporate business. Furthermore, her support was to be further insulated from the failure of the business received by the Plaintiff by a mortgage on the husband's share of the real estate as divided.

The Plaintiff from the property settlement received the operating business of the parties. At the time of executing the Separation Agreement any supposed hardship from sharing business profits with Defendant would have been illusory. He had the option of accelerating the release of the provisional alimony obligation in case of business failure by cooperating with his wife in finding a mutually acceptable buyer and thereby consummate the final division of assets.

The mortgage, however, secured both aspects of the support agreement and is perfectly valid and enforceable no matter what semantics is applied to the nature of the obligation secured. The monthly payments are secured by the mortgage and all accruals of the obligation prior to the filing for relief in the Bankruptcy Court are due and owing under the mortgage security, whether alimony installments or lease payments are involved. The court may order release of such a mortgage upon sale under the provisions of 11 U.S.C. § 363 only upon payment of all debt accruals secured by the mortgage. The total amount of the mortgage in the amount of $468,000.00 would be the maximum coverage as security for the required payments, but obviously only the amounts due and payable would give rise to exercise of the lien rights. It is also important to note that the obligation was cross collateralized with other real property in addition to the subject real estate. Hence, the mortgage would remain a valid and enforceable lien as security for the required payments as to the property not released by the exercise of Section 363 action.

## II

■ The Defendant's contract rights, therefore, established in major degree the criteria beyond which its sale cannot be ordered under § 363(h). In other words, any lesser sales price than a reasonable market value would violate the requirement that the detriment to Defendant is outweighed by benefit to the estate. Under such circumstances, the Plaintiff should as a minimum reallocate the proportionate share being attributed to the business assets (in the name of his wholly owned corporation) and increase the share attributable to the co-owned real estate. The prospective purchaser, in fact, testified that he does not care how the total purchase price is allocated, but is only interested in the amount of his total offer for both categories of property as a unit. Thus, a proper benefit to the estate can be maintained and still reduce the detriment to the interest of the Defendant, assuming that both parties can agree or demonstrate by competent evidence that the overall purchase price of $407,000.00 can bear court authorization for the sale of the estate property.

The Defendant has indicated by her testimony that she does not oppose an immediate sale of her undivided interest in the real estate if it is sold for a reasonable current

market value. Obviously, she should not be required to consent to a sale and the continuation of the airport business under auspices of the Chapter 11 proceedings or under new management for less than the capitalization value of the real estate (approximately $310,000.00). At least, her refusal to accept a lesser amount cannot be deemed arbitrary and unreasonable.

It is obvious from the facts that the best interest of both parties conscientiously to endeavor to find a satisfactory buyer is far more feasible than the possibility of a sale at a forced or foreclosure sale, which would defeat their respective interests and values both as provisional alimony and in the ultimate division of the marital property.

This Court is constrained to conclude the proposed sales price is not reasonable in light of current market values established by expert testimony at between the range of $310,000.00 to $584,000.00, or higher.

### III

In the context of the instant controversy, attention is especially directed to Page 1110 of the *Calhoun* decision, which reads, as follows:

Having found that the loan assumption has the effect of providing necessary support, the Bankruptcy Court must finally determine that the amount of support represented by the assumption *is not so excessive* that it is manifestly unreasonable under traditional concepts of support. Such an excessive allowance is at odds with the fresh start concept underlying federal bankruptcy law.... A universal consideration of state courts in setting such direct support payments is the supporting spouse's general ability to pay the support ordered. Under the mandate of Congress that the bankruptcy court fashion a common law of bankruptcy and the principle that one cannot contract away bankruptcy rights, the bankruptcy courts in the case of an obligation to hold the former spouse harmless on joint debts must, therefore, examine the ability to pay. If at the time the debts were assumed,[11] the assumption substantially ex-

ceeded a spouse's present and foreseeable ability to pay, the amount of the assumption which exceeded that ability should be not characterized as in the nature of support. We recognize the difficulty of making such a factual inquiry. However, the alternative would be to permit the debtor to contract away the right to discharge in bankruptcy and the opportunity for a fresh start. The inquiry will be limited to whether the amount agreed to is manifestly unreasonable in view of the earning power and financial status of the debtor spouse.

If the bankruptcy court finds the loan assumption too excessive to be fairly considered "in the nature of" support it must then *set a reasonable limit* on the nondischargeability of that obligation for purposes of bankruptcy. Use of factors similar to those a state court would employ to formulate a reasonable limit on support may be used to serve that limiting function in the context of a dischargeability determination. In such cases the bankruptcy courts should consider such traditional state law factors as the relative earning powers of the parties, their financial status, prior work experiences or abilities, other means of support and other facts relevant to the *substance of the result* achieved by the loan assumption in order to determine how much of the debt assumed can be fairly considered "in the nature of" support for purposes of federal bankruptcy.

The bankruptcy court's determination of whether a loan assumption constitutes a nondischargeable support obligation is a factual finding only reviewable in the court of appeals under the *clearly erroneous standard* of Fed.R.Civ.P. 52.

---

[11] If the circumstances of the debtor have changed from the time the obligation to the former spouse to pay joint debts are created so as to make such support now inequitable the bankruptcy court may consider the debtor's *current* general ability to pay insofar as it relates to the *continuing obligation to assume the joint debts.* [italics added]

Without dwelling on redundant details, general reference is made to the fact that the division of assets equally (many items

not having an established market value) between the parties contemplated that the Plaintiff would receive as his *aliquot* share the income-producing business (the airports). Subsequent economic conditions have demonstrated that the unappraised book valuation assumed by the parties did not comport with realistic economic market values. The Defendant did not realize the largesse contemplated by the Plaintiff, upon liquidation of her non-income producing share of their assets; and, there is no doubt that the only viable business reorganization possible for Debtor's (Plaintiff's) business success is dependent upon the liquidation sale of certain business assets. The operation of the flight school and the charter business is so far a possibility for reorganization.

Even though the provisional alimony (support and maintenance) aspects of the divorce decree cannot be discharged in bankruptcy as such, footnote 11 of the opinion in the *Calhoun* case clarifies that the current economic conditions affecting the parties warrant a considered reduction thereof. The issue of rejection or assumption of the contract lease payments by the corporation owned by the Debtor, however, is not at issue before the Court.

■ Based upon the economic conditions of both Plaintiff and Defendant, therefore, this Court is constrained to conclude that the provisional alimony must be reduced accordingly and the Plaintiff should no longer be required as alimony to guarantee the future funding of the monthly lease payments over the amount of the income realized from the leases. There is no evidence of what income, if any, the Defendant earns from real estate sales, but she now has a potential source of income; and, the Plaintiff is not in a position further to personally guarantee the monthly airpark lease payments. To such extent, the alimony liability should be dischargeable in bankruptcy. Such a conclusion is based upon the finding that the monthly payments are excessive in light of the current support needs of Defendant juxtaposed to the business circumstances now confronting the Plaintiff. It is the need and circumstances of Defendant as to support payments that must be considered rather than "general equitable considerations." Referring to the specific terms of the Separation Agreement, it should be emphasized that the provisional monthly support payments cease upon liquidation of the real estate as divided in the property settlement. It also bears emphasis to note by the terms of the Agreement that neither party can be forced into a judicial sale. Implicit in the understanding of the parties was the intent that one of the parties could neither be forced into a sale nor could unreasonably defeat a proper sale for a fair market value. Since the parties did not intend that the husband would be liable for permanent alimony after the division of property had been finalized and the real property sold, there was obviously no purpose in the insertion of a provision in the agreement that the temporary alimony would cease automatically upon remarriage or death of the wife before the expiration of a twenty-year end limitation. A final disposition of the divided property could be accelerated by either party. In this respect, neither the agreement of the parties nor the purport of Section 363 contemplates a forced sale based upon a future contractual entanglement of a non-consenting co-owner.

IV

■ There cannot be a forced consensual agreement with a third party under the guise of a sale under § 363. The possible necessity of future litigation because of the default of a party not privy with or consent to by the co-owner is such a detriment as cannot be imposed upon the co-owner as the result of an involuntary sale. The detriment to the non-consenting co-owner by the corresponding reduction in the sale price of the real estate by reason of the potential of the necessity for future litigation is a detriment which *ipso facto* outweighs any benefit to a Chapter 11 estate. In other words, the Court is not authorized to require the non-consenting co-owner to finance the unpaid portion of the real estate purchase

from the estate; but, only to sell "free and clear of any interest in such property of an entity other than the estate." A disposition which involves a non-consenting cotenant receiving the obligation of a third party payable at a future time is not "a money satisfaction of such interest." See 11 U.S.C. § 363(f)(5).

It is further noted that, "Sale under this subsection is subject to the adequate protection requirement.... At a sale free and clear of other interests, any holder of any interest, in the property being sold will be permitted to bid. If that holder is the high bidder, he will be permitted to offset the value of his interest against the purchase price of the property ... and be liable to the trustee for the balance of the sale price, if any." House Report No. 95–595, 95th Cong., 1st Sess. 345 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6302. See Senate Report No. 95–989, 95th Cong., 2d Sess. 56 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5842. Note, also, 11 U.S.C. § 363(e) as to the requirement of adequate protection to the entity owning the interests being sold. Under the instant facts, the Defendant should have been afforded the opportunity to either consent or to match the offer. She could then comply with the intent of the statute by applying her interest in the property to meet the cash proceeds by applying her mortgage balance due and owing.

If the proposed sale were for a reasonable market value and adequate protection provided to Defendant otherwise, a sale pursuant to Section 363 can only be authorized if "applicable nonbankruptcy law permits sale of such property free and clear of such interest." In Ohio a partition sale cannot be effected by a purchaser paying a partial payment and assuming an existing mortgage. If a court does not order the entire payment to be made in cash, the purchase money must be paid one-third on the day of sale, one-third in one year, and one-third in two years thereafter, with interest. Ohio Revised Code § 5307.11 and see 19 *Ohio Jurisprudence 3d,* "Cotenancy and Partition," § 133.

The Court reaches the following conclusions, to-wit:

1. The terms of the Separation Agreement which provided alimony payments funded from payments by corporations wholly owned by Plaintiff, Conrad Gerdes, as lessee, and guaranteed by personal liability assumed by Plaintiff, constitute provisional support and maintenance to Defendant, Delores V. Gerdes, which is not dischargeable as alimony under 11 U.S.C. § 523(a)(5)(B), until the property settlement provisions have been consummated.

2. The Separation Agreement as incorporated in the Decree of Divorce of the Domestic Relations Court on 26 March 1979 should be modified to relieve the Plaintiff of personal liability as guarantor of payments not made by the lessee corporation to Defendant, as co-lessor, since the filing of the petition for relief in this Court on 9 May 1983, excepting from the modification the amounts due and owing on the first mortgage to Citizen Federal Savings and Loan Association.

3. The proposed sale cannot be approved by the Court without the consent of both Plaintiff and Defendant because the sales price is not the current fair market value of the real estate. No determination of the validity and priority of liens can be made upon the evidence and is unnecessary until a valid sale is authorized.

4. The Defendant cannot by court order pursuant to 11 U.S.C. § 363 be involuntarily divested of her undivided interest in the subject property by forced assumption of the possibility of a future default by the purchaser in paying the money satisfaction for her interest for less than cash or by noncompliance with the Ohio law on partition sales.

5. The mortgage lien held by Defendant on the Plaintiff's undivided interest in the subject real property is a good and valid lien to the extent of unpaid lease installments and unpaid provisional alimony, as modified by the above decision; and Defendant must be afforded a reasonable opportunity to match the offer to purchase by

applying her mortgage lien balance due and owing.

6. A sale pursuant to 11 U.S.C. § 363 in Ohio does not provide adequate protection to a non-consenting cotenant unless the entire purchase price is cash upon delivery of deed or at latest payable in three annual payments conformably to the provisions of Ohio Revised Code § 5307.11 as to sales in Ohio as on partition.

The Court ORDERS that judgment be entered conformably to the above decision and the attorneys for the parties may submit such on a separate document within ten days for approval by the court as to form; and the clerk shall thereupon enter judgment conformably to Rules 5003 and 9021 of the Bankruptcy Rules.