**In the Matter of John Arthur QUINN, and Mary Eileen Quinn, and George William Quinn, d/b/a Quinn Farms, Debtors.**

**Mitzi QUINN, Movant,**

**v.**

**John Arthur QUINN, and Mary Eileen Quinn, and George William Quinn, Respondents.**

**Bankruptcy Nos. 84–01007–SJ–11, 84–01008–SJ–11.**

United States Bankruptcy Court, W.D. Missouri, St. Joseph Division.

Aug. 2, 1984.

Robert Cowherd, Chapman, Chapman & Cowherd, P.C., Chillicothe, Mo., for movant.

Arthur B. Federman, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P.C., Kansas City, Mo., for respondents.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL DECREE OF NONDISCHARGEABILITY OF A CERTAIN INDEBTEDNESS OF DEBTOR TO MITZI M. QUINN

DENNIS J. STEWART, Bankruptcy Judge.

Presently pending before the court is an action in which it is requested that the dischargeability *vel non* of certain obliga-

1. As is noted below, the action was filed as a motion for relief from the automatic stay. But, at the conclusion of the hearing of this matter,

tions owed by the debtor George William Quinn to Mitzi Quinn be determined.[1]

A hearing has been held on the material factual issues on June 14, 1984, whereupon Mitzi Quinn appeared personally and by counsel, Robert Cowherd, Esquire, and the debtor George William Quinn also appeared personally and by counsel, Arthur B. Federman, Esquire.

The evidence then adduced demonstrated the following material facts: On February 8, 1984, the marriage of the parties was dissolved by means of a "judgment entry" then made by the Circuit Court of Livingston County, Missouri. The "judgment entry" contains the following critical provisions:

(1) "The Court ... finds that the Petitioner [Mitzi Quinn] is under no disability, is capable of holding down full-time employment and is able and capable of supporting herself and contributing to the support of said minor children, therefore, the Court after considering the division of the marital property as hereinafter made, the conduct and needs of the parties, the ability of the parties to support themselves and contribute to the support of said minor children, and, considering all other relevant factors, finds that Petitioner is not entitled to maintenance from the Respondent; the Court further finds that Petitioner is a fit and proper custodian of said minor children [three under the age of 10] be placed in Petitioner .... After considering all relevant factors the Court finds that the total sum of $450.00 per month should be paid by Respondent in child support beginning March 1, 1984 ..."

(2) "IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that Respondent, George W. Quinn, pay the following marital debts and hold Petitioner, Mitzi M. Quinn, harmless therefrom, to wit: Installment note at Community Bank on the 1981 Buick Riviera with an unpaid balance of $6,744.37."

counsel for the movant requested that this court make the dischargeability determination.

It was the testimony of Mitzi M. Quinn in the hearing of the matters at bar that she believed the "hold harmless" provision to constitute an award of nondischargeable support; that the 1981 Buick is currently used by her as a necessary transport for the three children; and that she was, as of the time of the dissolution decree, unable to make any payment against the installment note.[2] George W. Quinn contends that he understood the "hold harmless" provision to constitute a division of marital property, particularly in view of the finding of the state court that Mitzi M. Quinn was able to support herself.[3]

Like other obligations running from a debtor in favor of a former spouse, "hold harmless" provisions in dissolution decrees are held to be nondischargeable in bankruptcy if they are in the nature of maintenance, alimony, or support, rather than a division of property. *Matter of Evans*, 2 B.R. 85 (Bkrtcy.W.D.Mo.1980); section 523(a)(5) of the Bankruptcy Code. In order to determine the character of the award, the bankruptcy court must ascertain the *intended function* of the award as of the date of its being made by the state court. *In re Williams*, 703 F.2d 1055, 1057 (8th Cir.1983); *Matter of Jensen*, 17 B.R. 537 (Bkrtcy.W.D.Mo.1982), and cases therein cited.[4] "Regardless of the characterization of an award in the divorce instrument itself, it is the actual function or purpose of that award which determines whether it is an award of maintenance, and thus nondischargeable, or a dischargeable property settlement." *Matter of Jensen, supra*, 17 B.R. 537, 539, n. 2. If the provision has as its intended function the providing of a necessary of life; it is ordinarily held to be nondischargeable support as maintenance.

*Poolman v. Poolman*, 289 F.2d 332, 335 (8th Cir.1961). In the matter at bar, the debtor contends that the award was not intended to serve a support function because the finding of the state court that the debtor's former wife was capable of supporting herself preclude any finding that the award can be for a necessary of life. If it is determinable that, at the time of the state court award,[5] the wife had no need for maintenance or support, then the award could not constitute a nondischargeable one. For maintenance and support are necessarily predicated upon need. *Matter of Evans, supra*, and authorities therein cited. On this crucial issue, the debtor contends that the state court decree is decisive in unequivocally finding that Mitzi M. Quinn is able to support herself and to contribute to the support of her three children. But the finding that she is able to contribute to the support of her three children is ambiguous in respect to precisely how much she should contribute and how much the debtor should contribute. In light of this ambiguity, her uncontradicted testimony to the effect that she was without the ability to make the installment note payments in combination with her other necessary expenditures and that she needs the automobile, in part at least, to provide transportation for her children has the effect of resolving the ambiguity. From this, it is reasonably inferable that the intended function of the "hold harmless" provision was as a part of the debtor's contribution to support of the children within the meaning of § 523(a)(5) of the Bankruptcy Code. As such, it cannot be dischargeable in bankruptcy. The facts of

---

**2.** Mitzi Quinn stated in her testimony that she was unemployed at the time of the entry of the dissolution decree and that she remained unemployed as of the time of hearing of this matter.

**3.** These contentions were made orally by counsel for George W. Quinn in the course of a hearing.

**4.** " '[P]rovisions to pay expenditures for the necessities and ordinary staples of everyday life' may reflect a support function." *In re Williams*,

703 F.2d 1055, 1057 (8th Cir.1983), quoting from *Matter of Jensen*, 17 B.R. 537, 540 (Bkrtcy.W.D. Mo.1982).

**5.** " '[U]nder the governing principles, the bankruptcy court must make its determination based upon the intended function of the award at the time of entry of the state court dissolution decree.' " *In re Vickers*, 24 B.R. 112, 116 (Bkrtcy. M.D.Tenn.1982), quoting from *Matter of Jensen*, 17 B.R. 537, 540 (Bkrtcy.W.D.Mo.1982).

this action compel the court to enter its decree of nondischargeability.

■ There were also other provisions in the state court dissolution decree upon which Mitzi Quinn apparently now bases a request for a decree of nondischargeability. In this regard, the court's slowness to recognize any other claim than that predicated upon the 1981 Buick might perhaps be excused. For, in substance, the debtor's former spouse has filed a nondischargeability complaint in the guise of a motion for relief from the automatic stay. This alone, upon proper timely objection might well be fatal to her claim. See Rule 7001(6) of the Rules of Bankruptcy Procedure. And otherwise, the other liabilities upon which the claim is grounded are but vaguely described in the "motion to modify automatic stay" as follows: "payment of debts incurred by the Movant for food and clothing prior to the entry of the Dissolution, for payment of Movant's attorney's fees, litigation expenses and court costs in said dissolution action and ... the joint debts incurred by the parties prior to the dissolution and hold the Movant harmless therefrom." No particularized evidence has been offered in support of any of these adverted-to potential species of nondischargeability except attorney's fees, the magnitude of which is identified as $5,777.90 in the state court dissolution decree. There is some indication that more than that figure is now claimed, but there has been no particularized proof of the services actually rendered or that they were rendered in connection with the state court dissolution proceedings. It is awards of attorney's fees made in conjunction with such dissolution and custody proceedings which are nondis-

chargeable as "related to the support function." *Matter of Evans, supra,* at 91. "[U]ndertakings by one spouse to pay the other's debts, including a debt to a lawyer for fees, can be 'support' for bankruptcy purposes." *In re Williams, supra,* at 1057. This court is therefore constrained to hold that the liability for attorney's fees in the sum of $5,777.90 is not dischargeable in bankruptcy.

### *Jurisdiction and Power of the Bankruptcy Court*

■ The recent vicissitudes of confusion and misunderstanding concerning bankruptcy court jurisdiction compel some treatment of the subject of jurisdiction. It is commonly said that jurisdiction attaches to a case at the time of its filing and that its extent and character are therefore defined by the law in effect at that time.[6] The actions at bar were filed during the interregnum between March 31, 1984, and June 28, 1984, when successive extensions of the transition statute took place. This court has earlier analyzed the jurisdictional situation then existing in *Matter of Transport Clearings-Midwest, Inc.,* 41 B.R. 528 (Bkrtcy.W.D.Mo.1984), as follows:

"The new jurisdictional statute which was passed on March 29, 1984, and which constitutes the sole source from which the bankruptcy court might lay claim to jurisdiction in both old Act and new Code cases, only compounded the pre-existing jurisdictional uncertainty. As this court has elsewhere analyzed, the statute appears to accomplish only a simple resurrection of the jurisdictional statute which was stricken as unconstitutional in

**6.** See *Matter of Monson,* 46 B.R. 3 (Bkrtcy.W.D. Mo.1984), to the following effect: "Jurisdiction ordinarily attaches as of the time of the filing of the petition or complaint to commence an action and its extent and character are ordinarily defined by the law in effect at that time. 'The time of filing suit is, of course, the critical date.' *Hawes v. Club Ecuestre El Comandante,* 598 F.2d 698, 703 (1st Cir.1979). 'The general rule is that a court's acquisition of jurisdiction over a case depends on the facts existing at the time its jurisdiction is invoked ...' 'And where, in view of the facts existing at the beginning of the

proceedings, the court has acquired jurisdiction over a case, that jurisdiction is ordinarily not ousted by subsequent events.' 20 Am.Jur.2d *Courts,* section 142, p. 491 (1965). 'A court's jurisdiction in a case depends upon the facts which exist at the time the jurisdiction was invoked, i.e., at the time of the commencement of the action ... That jurisdiction is not ousted by subsequent events.'" *In re Stahl, Asano, Shigetomi Associates,* 36 B.R. 179, 182 (Bkrtcy.D. Hawaii 1983).

**626**

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 [102 S.Ct. 2858, 73 L.Ed.2d 598] (1982).

"Under such a statute, the bankruptcy court, it appears must somehow be held to be qualified to exercise the jurisdiction of an Article III court or else indulge in the vain exercise of void jurisdiction. The interim emergency rule for bankruptcy administration offers little or no aid in this situation. Under the text of that rule, the bankruptcy court may not refer this case to the district court, either by way of a report and recommendation or otherwise. This is especially so when any power of the bankruptcy court to make such references, if employed regularly in a matter such as this, would defeat the purpose of the emergency rule—to prevent inundation of the district court with bankruptcy matters. Yet, to keep the case in the bankruptcy court is to exercise the federal judicial power pursuant to Article III of the Constitution. For, when jurisdiction is conferred by statute to determine justiciable matters, the bankruptcy court may no longer avoid exercise of the federal judicial power by electing to exercise the nonstatutory, inherent jurisdiction of a court of equity with a res in its possession.

"Further, even though the court has now awaited two additional deadlines for Congressional action—May 1, 1984, and May 26, 1984—, they have only resulted in Congressional repassage of the same statute. Accordingly, it is incumbent upon the court at this juncture, in view of the claimant's persisting demands for action, to find a rational basis for its exercise of the federal judicial power, if possible. In this regard, it is sometimes said that a non-Article III court may exercise the federal judicial power for a transitory period. But, to date, that doctrine has been held to be applicable only in territories and nascent states where local exigencies are such that territorial courts are the only courts available to exercise the federal judicial power. In all other contexts, the emergency exercise of Article III power by non-Article III courts has not been envisaged and has held any resulting judgment to be subject to reversal on appeal on review initiated *sua sponte* by the reviewing court. The exercise of such power by this court on such a basis would be especially risky in view of the bankruptcy court's not coming within any of the categories of courts which have been permitted temporarily to exercise Article III power on a temporary emergency basis.

"Can there be any other basis for this court's exercise of such power? Formerly, the Supreme Court of the United States, in *Glidden Co. v. Zdanok*, 370 U.S. 530 [82 S.Ct. 1459, 8 L.Ed.2d 671] (1962), held that an Article I court could mature into an Article III court by virtue of Congress' conferring upon it such responsibilities as necessarily engage the federal judicial power; that, although the statutory declaration of Congress as to a court's classification could not be ignored, it is the courts themselves who have the power and duty to determine a court's constitutional status; that, even if the judges on a court were not invested with Article III status at the time of their initial investiture, their status matures into Article III status when the court on which they sit becomes an Article III court; and that their reappointment is not a necessary prerequisite to their being accorded Article III status in such a manner, so long as their prior appointment was presidential. The authorities hold with universality that a legislative court which performs only duties which are capable of being performed by an administrative officer as by a judicial officer may, in the discretion of Congress, be denominated either an Article I court or an Article III court. But a court which is assigned duties by statute which are necessarily judicial must be regarded as an Article III court. Can it be said that, under these longstanding principles, Congress' resurrecting section 241 as the bankruptcy court jurisdictional statute in the wake of the *Marathon*

decision, *supra,* and, at the same time, making the bankruptcy judges' appointments presidential in character has converted the current interregnum court into an Article III court? That is a determination which cannot be made with any assurance of finality by this court and accordingly must await future decision. It is further to be noted that the interregnum jurisdictional statute may not be applicable to the matter at bar, which arises out of an old Act case. The transition period, during which old Act cases and matters arising in them are to be determined as if the new Code had not come into being, see § 403(a) of P.L. 95–598, has not yet ended. If so, the foregoing observations apply with even greater telling force to the applicable jurisdictional statute under the former Act. For, in the recent decision of *Lindsey v. Ipock,* 732 F.2d 619 (8th Cir.1984), our court of appeals has intimated that *Marathon, supra,* although it has prospective application only, applies to decisions made after its effective date.

"It is recognized that the letter of counsel is not really sufficient, however, to relieve the court of the possibility that simply adjudicating a claim under a statute directly conferring judicial powers upon it constitutes an exercise of the federal judicial power. In this respect, however, the bankruptcy court may rely upon a very recent decision of our district court in *Matter of Hamilton,* Civil Action No. 83–6070–CV–SJ (W.D.Mo. May 14, 1984), in which it was held that the bankruptcy court has no authority to render advisory opinions. This seems to recognize—if not the constitutional status of the bankruptcy court—at least its authority to render decisions in an exercise of the federal judicial power. For its only constitutional courts which cannot render advisory opinions. 'A federal court that is not subject to the limitations of Article III may, of course, be required to render an advisory opinion.' 6A

Moore's Federal Practice para. 57.12, p. 57–109, n. 2 (1983). This court therefore concludes that the *Hamilton* decision may provide a basis for the bankruptcy court's current exercise of the federal judicial power."

The same jurisdictional basis, the decision of the district court, in *Matter of Hamilton, supra,* must accordingly be relied upon as the basis of jurisdiction in the action at bar.

The power of the bankruptcy court to act presents a slightly different question.[7] As of this date, it is contended by some that the added tenure granted to bankruptcy judges by the Bankruptcy Amendments Act of 1984 is unlawful and that exercise of any power under that statute can only result in an order or judgment which is null and void. This is the position of the Administrative Office of United States Courts, which has insisted that former bankruptcy judges, whose tenure, they insist, ended as of June 27, 1984, instead exercise judicial authority only as United States magistrates. On the other hand, others contend that the reappointment effected by the Bankruptcy Amendments Act of 1984 is not only effective but also renders any actions undertaken in bankruptcy cases by United States magistrates null and void.

██ But this court need not resolve that dispute with respect to the actions at bar, which were filed long before the lapsing of the transition statute on June 28, 1982, created the seeming hiatus in the tenure of bankruptcy judges. As to these actions, therefore, the undersigned simply sits in the status of a holdover judge, until a successor is appointed. Both the relevant portion of the transition statute and general legal principles support this basis of judicial power. It is to be noted in this regard that the relevant portion of the transition statute, section 404(b) of Public Law 95–598, originally purported to extend the term of a bankruptcy judge to "March 31, 1984, or when his successor takes of-

---

7. "Jurisdiction is of several kinds as jurisdiction of the subject matter; of the parties; and what is termed venue jurisdiction. The latter means

the power of the particular court to function." *Brand v. Pa. R. Co.,* 22 F.Supp. 569, 571 (E.D.Pa. 1938).

fice." The successive Congressional extensions of the date of March 31, 1984, properly construed according to time-honored canons of construction, did not delete the language and effect of the initial *minimal* extension to the time when a successor *lawfully* takes office.[8] Accordingly, according to the lasting effect of the transition statute, the undersigned, as to the action at bar, continues to sit as a holdover judge.

Further, under the general law, even in the absence of such a statutory provision, a judge whose term of office runs out ordinarily retains power to act, *de facto* if not *de jure*, until his successor is appointed, with respect to actions filed prior to the end of the term of office.[9] This theory of *de facto* power of the sitting bankruptcy judges finds support in the very recent order issued in *Matter of Walker*, Civil Action No. 83–6005–CV–SJ, (W.D.Mo. July 12, 1984), by the distinguished district judge of the St. Joseph Division, the Honorable Howard F. Sachs.

Accordingly, it is concluded that the bankruptcy court has jurisdiction and power to issue the decree warranted by the law and the facts in the actions at bar. It is therefore

ORDERED, ADJUDGED AND DECREED that the obligation of George William Quinn to Mitzi M. Quinn on account of the installment note in the 1981 Buick, and for attorney's fees of $5,777.90 be, and

they are hereby, declared to be nondischargeable in bankruptcy.

---

**8.** See *Matter of Monson*, Adversary Action No. 82–0741–SJ (Bkrtcy.W.D.Mo. July 18, 1984), as follows: "The successive Congressional extensions of the date of March 31, 1984, properly construed according to time-honored canons of construction, did not delete the language and effect of the initial minimal extension to the time when a successor lawfully takes office. For the form of the successive extensions was simply to replace 'March 31, 1984,' with subsequent dates, finally ending on June 27, 1984, and not to delete the language, 'or when his successor takes office.' In respect of each extension, a subsequent extension provided that the term of a sitting bankruptcy judge should 'expire on' the date on which the extension was to end. But this did not purport to end his

holdover status as contained in the language, 'or when his successor takes office.'"

**9.** See *Matter of Monson*, Adversary Action No. 82–0741–SJ (Bkrtcy.W.D.Mo. July 18, 1984), as follows: "'There is authority that even in the absence of statute it is the right and duty of an incumbent judge to hold over and exercise the duties and functions of the office until his successor is appointed. But under such circumstances he is not a judge de jure, but at most a judge de facto. He merely performs the functions of the office until a duly qualified appointee appears, and then is bound to yield the office to the appointee ...' 16 Am.Jur.2d *Judges* section 16, pp. 105–106 (1969)."