**In re Thomas Carson HELM, Debtor.**

**Thomas C. HELM, Plaintiff,**

**v.**

**Kay Hampton HELM, Defendant.**

**Bankruptcy No. 3–83–00867.
A.P. No. 3–84–0064.**

United States Bankruptcy Court,
W.D. Kentucky.

April 15, 1985.

Walter J. Swyers, Jr., Louisville, Ky., for plaintiff.

Kevin P. Keeler, Louisville, Ky., for defendant.

Glenn Schilling, trustee, Louisville, Ky.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

This opinion ultimately reduces itself to the simple exercise of applying the rule of one case to the facts of another. But because we deal with an important new rule of law and vigorously disputed facts, our writing, while simple, will be necessarily thorough.

The law we apply is that declared in *Long v. Calhoun*,[1] a landmark 1983 opinion of the U.S. Sixth Circuit Court of Appeals, dealing with the treatment of divorce issues in bankruptcy courts. The *Calhoun* rule is an elegant formulation, probably destined for citation as a seminal work in the new federal common law of domestic relations, but it is fraught with forebodings for bankruptcy judges and divorce practitioners. *Calhoun* creates a new federalism matrix for domestic relations law; promises to make the bankruptcy contingency, like tax planning, a major consideration in the practice of family law; and could affect significant changes in the procedural routine of divorce practice before state courts. It distends the applicable federal statute to allow economic results otherwise unobtainable. It accomplishes all of these things at considerable uncertainty costs to lawyers and litigants, as will be seen.

The facts we consider are those of *Helm v. Helm*, a caption well known by now at all levels of the Kentucky judicial system. The maintenance question which forms the core of this persistent litigation has been treated with consistency by all of the Kentucky courts which have entertained it. Our result will stand at variance from those determinations. With that conclu-sion foretold, this, our first analysis and application of the new rule, will begin with the judicial history of *Helm v. Helm*.

\* \* \* \* \* \*

Thomas and Kay Helm were divorced in July, 1981. The decree of the Jefferson Circuit Court reserved ruling on the property issues of the case, and a month later the parties entered into an agreement which divided the marital property and provided for a series of payments styled "periodic maintenance". The relevant provisions of the agreement are these:

### 1. PERIODIC MAINTENANCE

A. As and for periodic payments for the support and maintenance of WIFE and continuing until the death or remarriage of WIFE, or until January 1, 1993, whichever shall first occur, HUSBAND shall pay WIFE the sum of $1,000 per month commencing August 1, 1981. HUSBAND shall pay WIFE $11,500 as of the execution of this Agreement, which sum shall be in lieu of maintenance for the first ten (10) months following execution of this Agreement, (through and including May, 1982) and, as of July 1, 1982, HUSBAND shall pay WIFE $11,500, in lieu of maintenance for the ten months of July, 1982 through April, 1983, inclusive; for all other months, maintenance shall be in the monthly amount of $1,000 per month.

. . . . .

8. B. It is specifically intended by the parties that the payments of periodic maintenance pursuant to paragraph 1 hereof shall be includable in the gross income of WIFE pursuant to § 71 of the Internal Revenue Code of 1954, as amended, and that all such payments shall be so reported by WIFE for federal and state income tax purposes. All such payments shall be deductible to HUSBAND pursuant to § 215 of the Internal Revenue Code of 1954, as amended.[2]

---

**1.** 715 F.2d 1103 (6th Cir.1983).

**2.** Property Settlement Agreement at pp. 2, 10. It is clear that the provisions relating to the payments styled "maintenance" were written to

allow the husband to deduct those payments from his federal income taxes under the "safe harbor" provisions of § 71(c) and § 215 of the Internal Revenue Code. If the debtor had been

The agreement made no mention of any of the traditional, relevant factors which state courts generally review in considering an award of alimony, such as the relative earning power and financial holdings of the parties, their work history and abilities, and other sources of support.

The agreement was filed with Jefferson Circuit Court in October, 1981, but six months later Thomas Helm moved to have the agreement set aside on the grounds of unconscionability. After a hearing the court found the agreement was not unconscionable and incorporated the document by reference in the final decree of dissolution. Thomas Helm appealed unsuccessfully to the Court of Appeals, then further petitioned the Kentucky Supreme Court for discretionary review of that adverse determination, again unsuccessfully.

On April 29, 1983, Thomas Helm filed a petition in bankruptcy, listing over $1.4 million in debts and assets valued at only $12,600. The separate filing for his real estate firm showed a negative net worth of over $600,000.

With the bankruptcy pending and while the maintenance dispute worked its way through the appellate process, the parties continued to skirmish in the state trial court.

In May, 1983, Thomas Helm moved to require his former wife to show cause why her maintenance should not be eliminated in light of his worsened financial condition. In July the Jefferson Court ruled in her favor, but even while that motion was pending Thomas Helm filed another, putting the state court on notice of the pending bankruptcy and requesting a stay of further proceedings. Kay Helm responded with a motion of her own, for a common law judgment for the total unpaid maintenance. The Jefferson Court refused to consider either of the pending motions until a ruling was handed down in the pending appeal.

Again in March, 1984, Kay Helm sought a contempt rule against Thomas Helm for failure to pay maintenance. He responded with a motion for a protective order to prevent any discovery, invoking the protection of the bankruptcy court. That motion was denied by a Jefferson Circuit Court Order of June 6, 1984, which again reiterated the binding nature of the payments as maintenance, holding the parties to the language of their original agreement. During the pendency of this motion the Kentucky Supreme Court had declined to review the matter, and the June 6 Order was harmonious with that treatment of the case.[3]

---

forced to make the entire $143,000 payment in a lump sum he would have received no deduction and could have recognized a taxable gain if he transferred appreciated property in satisfaction of that debt *United States v. Davis,* 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962); *Swain v. Commissioner,* 50 T.C. 302 (1968), *aff'd,* 417 F.2d 353 (6th Cir.1969).

**3.** The Jefferson Circuit Court stated:
   The periodic maintenance provision in the agreement also provides that the payments due the petitioner shall continue "until death or remarriage of WIFE, or until January 1, 1993, whichever shall first occur. This language is the provision in KRS 403.250(2) which provides that "the provisions as to property disposition may not be revoked or modified." It seems unlikely these parties would have agreed to payments designated as maintenance, which conform with the statutory language which governs maintenance when in fact these payments were intended by the parties to be property disposition.

The property settlement also provides in § 8(B) that the payments made by the respondent to the petitioner are deductible from his income pursuant to § 71 of the Internal Revenue Code and are includable in the wife's income under the same provision. § 71 permits the deduction of maintenance or alimony payments. It does not allow the deduction of payments made as part of a property settlement.

In *In re Thompson,* there was no designation as to what the payments were for. *In the case at bar the specific language of the agreement is "as and for periodic payments for the support and maintenance of WIFE...." The Language of the agreement could not be clearer.* [Emphasis added].

This reasoning fails to take into account the tax incentives discussed in note 2, *supra,* of making periodic payments in this manner. Also it is clear that the debtor did not fully understand the significance of the use of the term maintenance. From his testimony at the hearing and the documents introduced it is clear that the

One month later, on July 6, 1984, Thomas Helm filed a complaint with this court seeking a determination of the dischargeability of his contractual "maintenance" obligation. The complaint was specifically cast to force a *Calhoun*-type determination.

Evidence produced at the hearing disclosed that Kay Helm now owns net assets conservatively valued at $300,000 to $400,000 [4] and has had annual income for the past two years of $55,000 and $28,000, including a one-time capital gain of $35,000 in 1983. She has voluntarily foregone approximately $15,000 per year in additional income which could be realized if she would reinvest $160,000 presently being held in high-risk, no-yield, speculative securities.

Kay Helm's employment history is richly diversified. She has worked for and been part-owner of an art gallery, a travel agency and a prestigious interior design firm. She is licensed as a stockbroker and a real estate agent.

By way of contrast, the evidence showed that Thomas Helm owns only nominal assets and had a net income after business expenses [5] of $3,000 in 1983 and $9,227 in 1984. His wholly-owned real estate corporation, his sole source of income, is bankrupt.

The state court record produced at the hearing clearly showed that *at no time during the entire protracted divorce proceedings did a court ever make an independent judicial determination as to the propriety of an award of maintenance under the facts of this case.* The importance of that fact to our ultimate resolution cannot be overstated.[6]

\*    \*    \*    \*    \*    \*

Before addressing the primary legal questions of the case we will consider two preliminary issues raised by the defendant Kay Helm.

---

debtor was concerned about his former wife's well-being at the time of the divorce and signed the agreement to "get the divorce over with." The evidence also shows that the debtor viewed the so-called maintenance payment as nothing more than an additional distribution of property which contained certain tax benefits due to the way it was structured. *See In re Helm,* transcript of hearing at 79–88. [Hereinafter referred to as the Helm transcript]. We also wish to make it clear that we are not, in any way, criticizing the Jefferson Circuit Court for its order of June 6, 1984 in the Helm divorce proceeding. From our reading of the law of domestic relations in Kentucky, that opinion appears to be correct as to the matters directly relating to possible modifications of the periodic "maintenance" payments. We also cannot find fault with the state court's failure to apply *Calhoun* guidelines in its preliminary evaluation of the dischargeability issue. From the pleadings presented to this court from that action, it is clear that neither counsel brought the then recently decided case to the Jefferson Circuit Court's attention. *See also* note 14, *infra.*

4. Depending upon the valuation one accepts, Kay Helm's net worth could be as much as $500,000. Her assets include the remaining balance of a note which was assigned to her as part of the property settlement. The approximate value of the note is $72,000 and it is being repaid at the rate of $812.50 per month.

5. Helm's gross income figures were high by comparison, $28,405 and $19,607 respectively,

reflecting the higher costs of starting up a new real estate sales business.

6. The Sixth Circuit Court of Appeals stated in *Calhoun:*

> We recognize that such [bankruptcy court] inquiry may, in effect, modify a judgment or decree of a state court. In view of the congressional mandate to apply a federal standard, this cannot be avoided. Actual interference, however, will probably be minimal. In a contested case the likelihood that the state court would have awarded support where it was unnecessary is sufficiently remote that such interference by the bankruptcy court will seldom be necessary. When, as in the present controversy, the decree is not the result of a contested case but merely incorporates the parties' agreement, the concern for comity is of less importance. To allow the parties' characterization of a loan assumption in such cases to control pro forma would permit the debtor to agree to forego his rights under the bankruptcy laws.

*Long v. Calhoun,* 715 F.2d at 1110 n. 10. In the present case, the property settlement agreement was merely incorporated into the decree of divorce. The lengthy litigation on the issue of whether that settlement agreement could be modified is *not* the type of litigation the Sixth Circuit referred to when it stated that *"In a contested case ... interference by the bankruptcy court will seldom be necessary." Id.*

First, the defendant has moved for dismissal of this dischargeability action on the grounds of collateral estoppel and res judicata.[7] In order to properly analyze these two similar doctrines we must first recognize the critical differences between them, as described by the Eighth Circuit Court of Appeals in *Lovell v. Mixon.*[8]

Under the doctrine of collateral estoppel, four criteria must be met before a determination is conclusive in a subsequent proceeding: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *In re Piper Aircraft Distribution Anti-trust Litigation.* 551 F.2d 213 (8th Cir.1977). The doctrine of res judicata bars a later suit when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involved the same cause of action; and (4) both suits involved the same parties or their privies. *Ward v. Arkansas State Police,* 653 F.2d 346 (8th Cir.1981). Thus, the application of collateral estoppel or issue preclusion is limited to those matters previously at issue which were directly and necessarily adjudicated. *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In contrast, res judicata or claim preclusion bars the relitigation of issues which were actually litigated or which could have been litigated in the first suit. *Federated Department Stores v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

However, both doctrines are applied only when the party against whom the early decision is being asserted had a "full and fair opportunity" to litigate the issue in question. *Kremer v. Chemical,* 456 U.S. 461, 481 n. 22, 102 S.Ct. 1883, 1897 n. 22, 72 L.Ed.2d 262 (1982).[9]

When we apply these general principles to the facts before us, it is clear that neither doctrine bars this court's consideration of the dischargeability issue.

Under the leading Supreme Court case of *Brown v. Felsen,*[10] we are permitted to inquire into the true nature of the debt in question because such an inquiry would have been meaningless or superfluous in the earlier actions.

Among the reasons given by the Court for its decision in *Brown v. Felsen* was that the issues relevant to the dischargeability proceeding had been largely immaterial to the earlier state court action. Therefore an aggressive application of res judicata would force the dischargeability issues to be litigated in state court at a time when neither party had a full incentive to litigate them. The court further reasoned that Congress intended to commit all questions regarding dischargeability to the Bankruptcy Courts, and that this intent could be thwarted by considering dischargeability questions as having been tried in earlier state court actions.[11]

Nor are we precluded from considering the question of this debt's dischargeability by the rules of collateral estoppel. In the case of *Spilman v. Harley,* the Sixth Circuit paraphrased the criteria for the imposition of collateral estoppel by stating that for the doctrine to apply, "the *precise issue* in the later proceedings [must] have been

---

7. U.S. Bankruptcy Courts have exclusive jurisdiction under the 1970 amendments to the Bankruptcy Act to determine the Dischargeability of debts governed by 11 U.S.C. §§ 523(a)(2), (4), (6). *Matter of Pigge,* 539 F.2d 369, 371 (4th Cir.1976). However with respect to dischargeability determinations arising under other statutes, the bankruptcy court does not have exclusive jurisdiction and res judicata and collateral estoppel may apply. *Spilman v. Harley,* 656 F.2d 224, 226 n. 2 (6th Cir.1981).

8. 719 F.2d 1373 (8th Cir.1983).

9. *Id.* at 1376.

10. 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

11. *See generally, Brown v. Felsen,* 442 U.S. at 138, 99 S.Ct. at 2212.

raised in the prior proceeding, that the issue was actually litigated and that the determination was necessary to the [final] outcome."[12]

In point of fact, *Long v. Calhoun* itself remarkably foreshortens this court's use of collateral estoppel as an instrument of judicial finality. In *Calhoun,* the Sixth Circuit Court of Appeals directs bankruptcy courts to closely examine all "support" payments to see if they are *actually* in the nature of alimony, maintenance or support. *Calhoun* thus seems to preclude the imposition of the doctrine of collateral estoppel unless the state courts have used *Calhoun* standards in awarding alimony, maintenance or support.[13] The record shows that none of the state courts which heard the Helms' divorce case ever fully considered the issues necessary to a valid, final judgment on the question of dischargeability under the analysis set forth in *Calhoun.*[14] The collateral estoppel argument therefore must be rejected. By separate order, as required by the rules, we will overrule the defendant's motion to dismiss on that ground.

■ The second preliminary issue we must consider before we directly address the question of dischargeability involves the applicability of the *Calhoun* analysis to the present case. Kay Helm contends that:

The guidelines formulated by the [Sixth Circuit Court of Appeals] in *In re Calhoun,* ... have no application to the [present] case.

[This] case presents the issue of the non-dischargeability of [an] ongoing spousal maintenance obligation ... By contrast, *In re Calhoun* presented the issue of the dischargeability of *assumptions of debt* by a former spouse in the context of the dissolution of a marriage.[15]

This court is unable to view the *Calhoun* opinion in such a restrictive manner. Judge Kennedy's writing is a carefully detailed construct, a literal handbook for bankruptcy judges, and to perceive it only as a narrow assumption-of-debt case is to view the world through the wrong end of a telescope. We take *Calhoun* as having general applicability to all support cases brought under 11 U.S.C. § 523(a)(5).[16]

Having disposed of the preliminary defenses, we now proceed to the heart of the matter, which is the application of the *Calhoun* formula to the Helm maintenance question.

There is a clean geometry about *Calhoun.* The operative portion of the opinion, lining out the court's reasoning and creating a new canon for the bankruptcy judge's guidance on remand, establishes

---

**12.** *Spilman v. Harley,* 656 F.2d at 228. [Emphasis added].

**13.** This is not to say that bankruptcy courts are to totally ignore prior state court divorce decrees. In cases where it is clear that the state court has clearly and carefully considered the question of support *in the context of a contested case* (as opposed to the facts of the present case where the state court merely incorporated a "property settlement agreement" into the divorce decree) then it is extremely unlikely that a bankruptcy court would make a contrary finding as to the true nature of the support obligation. *See Long v. Calhoun,* 715 F.2d at 1109 n. 10.

**14.** It is true that the Jefferson Circuit Court refused to grant the debtor's motion for an order "protecting" the debtor from his ex-wife's discovery efforts on the grounds that the debt was a maintenance obligation, and, by implication, nondischargeable. *Helm v. Helm,* No.

81CI00643, slip op. at 3, (Jefferson Circuit Court, 16th Division June 6, 1984). However, that court's ruling did not address all the issues concerning the "periodic maintenance" obligation's dischargeability which are set forth in the *Calhoun* opinion. Also, the Jefferson Circuit Court's order denying the debtor's motion for a protective order did not constitute a valid, *final* judgment as is required for the imposition of collateral estoppel. *See Lovell v. Mixon,* 719 F.2d at 1376.

**15.** *Defendant's Hearing Memorandum: The Non-Applicability of* In re Calhoun *to the case at the bar* at 1, 6.

**16.** *Matter of Wesley,* 36 B.R. 526, 529 n. 1 (Bkrtcy.S.D.Ohio 1983). ("While *In re Calhoun,* 715 F.2d 1103 (6th Cir.1983) specifically involved a debt assumption provision in a separation agreement, language of the Court's opinion has general applicability in cases brought under § 523(a)(5)".)

four separate levels of judicial analysis.[17] They are arranged logically and in ascending order of refinement, so that any given one need be applied only if the one immediately preceding has not produced the solution. Under this progressive formula we are directed to consider whether:

(a) The *intent* of the state court or the parties was to create a support obligation;

(b) whether the support provision has the actual *effect* of providing necessary support;

(c) the amount of support is so excessive as to be *unreasonable* under traditional concepts of support, and finally,

(d) if the amount of support is unreasonable, *how much* of it should be characterized as nondischargeable for purposes of federal bankruptcy law.

For ease of discussion we will refer to the four components of the *Calhoun* analysis, in order, as *intent, effect, amount* and *apportionment.*

The Helm case may be disposed of at the first level of analysis, that of intent. However, we will work our way through the entire *Calhoun* logarithm, not merely to demonstrate to our senior court the conscientious application of our mandate, but to prevent the relitigation on remand of any unresolved points of law. That is to say, our primary consideration is to facilitate the inevitable appeal and thereby bring at least a hope of finality to this apparently interminable quarrel. Toward that end the following four-part analysis is offered.

(a) *Intent.* Our initial inquiry is directed to "whether the state court or the parties to the divorce *intended* to create an obligation to provide support ..."[18] The inquiry is particularly burdensome for two reasons. First, in uncontested cases such as this, the court must determine what the intent of *each party* was with respect to the debt in question.[19] Second, it is extremely difficult to divine a party's intent in light of the fact that generally the parties to a divorce are rarely interested in the legal characterizations given to obligations created by a divorce settlement or decree. In the words of a sister Bankruptcy Court: "Few are the cases where either party knows or cares whether it [the debt] is alimony, support or [a] division of property. Each is interested only in what each will get or have to pay."[20]

After careful consideration of the testimony and documentary evidence, we find that Kay Helm has failed to prove [21] that she and Thomas Helm intended the "periodic maintenance" payments to be alimony or support. The evidence showed that while she may have regarded the payments as alimony, he saw the payments as nothing more than a method of transferring property which carried with it substantial tax and economic advantages.[22]

Our conclusion as to the debtor's intent is supported by the language of the proper-

---

**17.** Analytical scholars may argue, not without some support in the language of *Calhoun* itself, that the formula contains three, not four, parts, with (d) above being in actuality an extension or subpart of (c). But because the final step is the one which requires a judicial finding of two different types of maintenance, reasonable and unreasonable, that is facially inharmonious with 11 U.S.C. § 523(a)(5), we have included it as a separate and final step in the *Calhoun* analysis.

We have also taken a necessary editorial liberty in our summary of the four-part analysis. *Calhoun* used the phrase "loan assumption" several times in the formula, 715 F.2d at 1109–1110. Having held that *Calhoun* applies to all support cases, we have eliminated that phrase as unduly restrictive.

**18.** *Long v. Calhoun,* 715 F.2d at 1109.

**19.** In a contested divorce case, the Bankruptcy Court need only consider the intent of the *court* which created the obligation by its decree. *See id.* at 1109 n. 10. ("In a contested case the likelihood that the state court would have awarded support where it was unnecessary is sufficiently remote that ... interference by the bankruptcy court will seldom be necessary.").

**20.** *Matter of Jenkins,* 32 B.R. 978, 982 (Bkrtcy.S. D.Ohio 1983). *See also Helm transcript* at 80–88.

**21.** It is the contesting spouse's burden to establish the nondischargeability of this debt. *Long v. Calhoun,* 715 F.2d at 1111 n. 15.

**22.** *See* note 2, *supra.*

ty settlement agreement relating to the tax consequences of the maintenance payments,[23] the fact that the funds for the two initial payments of periodic maintenance came directly from the last two installment payments on a debt owed the debtor,[24] and by the testimony of the debtor, which we found to be extremely persuasive. While the testimony of the former wife and the other evidence[25] presented by her was neither insignificant nor incredible, it does not overbalance the debtor's testimony on his own intent, forcefully delivered and intrinsically most believable. Consider the following colloquy between Thomas Helm and opposing counsel, questioning him on cross-examination.

Q Okay. Now with regard to the first two payments, the lump sum payments that you talked about, does the agreement provide that this is a division of property, or is it set out as maintenance?

A I don't know. Her lawyer said we are going to write it so it is deductible. And I didn't even know those were in there, but ...

Q Well, is it your testimony now that that was—the first two years was, in fact, a division of property, or is it your testimony that it was intended and was, in fact, maintenance, and that the lump sum payments just formed a source?

A It was all a division of property. I mean, this list was, you know, was supposed to equalize things. And there was never any discussion about how much I made and how much she needed or how much, you know, what my expenses were.

Q Okay. Well, so your testimony now is that there was no maintenance under the terms of the divorce decree and, in fact, it was all a division of property?

A [The witness nods his head in the affirmative.] Yeah.

Q Okay. Can you explain to the Court why it is that when you were asked that same question back at the time of the Circuit Court's hearing, with regard to your argument that the whole agreement was unconscionable, and you were asked whether those $11,500 payments were actually a way of paying her a thousand dollars a month maintenance, your response was that, yes, that it was, in fact, maintenance?

A I don't remember that. I protested all along that, you know, that the company didn't have the money that Judge Kunzman thought it had. And—

Q Well, Mr.—

A —that I couldn't make the payments.

Q Mr. Helm, the question and answer were quoted by Judge Ewing in her findings, which findings have been provided to the Court by way of a certified Act of Congress.

She quoted from the transcript of that hearing in which you were asked that specific question and your answer under oath was that the $11,500 payments were, quote, "Actually a way of paying her a thousand dollars a month maintenance." That was your answer under oath.

Now today your answer is that it was a division of property.

My question is: When were you telling the truth and when weren't you?

A I never understood. The whole time—every time we were in court the argument between the lawyers was whether we had an agreement or didn't have an agreement. And since then it has been the same argument. Whether we could discuss it or not.

And all the time I was trying to say that I didn't have the money that everybody

---

23. *See* note 2, *supra* and accompanying text.

24. *Helm transcript* at 68. (Testimony of Thomas Helm).

25. The bulk of Mrs. Helm's evidence was a set of personal notes written by the debtor to Mrs. Helm. In these notes Mr. Helm discussed sever-

al possible settlement options with Mrs. Helm. The fact that the debtor referred to some of the payments in his settlement proposals as maintenance is not controlling. Substance must prevail over form. *Long v. Calhoun,* 715 F.2d at 1109; *In re Spong,* 661 F.2d 6, 9 (2nd Cir.1981).

thinks I have got. And I couldn't pay what everybody wanted me to pay.

Now, is that explanation—

Q All right. But the question here seems—

A Ms. Olfather said they would write the agreement such a way that it would make it deductible. And that sounded good to me. But there was never any discussion of what my income was, what my budget was, and, you know, what her budget ought to be or what income she might have.

Q There was never any discussion about whether Kay would need maintenance in order to get by after the divorce?

A No.

.    .    .    .    .

Q All right. So is it still your testimony that throughout this period of time when you and Kay and your attorneys were negotiating for a settlement of the divorce, that there was a discussion about maintenance and whether Kay should receive it?

A Yeah, that is right. Every time we ever met Ann Olfather [Kay Helm's attorney] put on an act and disparaged everything that I said. Tried to show facts and figures. Okay. And we never—okay. We never ever sat down with either one of our budgets or either one of our incomes.

And then when I tried to do it, she put on a—she made—arranged for Kay not to get there and put on an act.

My lawyer was going through a divorce. He kept telling me to talk to Kay. And that is probably that is what these—maybe that is why I wrote her notes. I was trying to get things settled.

Q Okay.

A And I was trying to give her things. As a matter of fact, we lived on a whole lot more money than we were making.

Q And it was your intention to provide her with support after the marriage?

A I was intending to give her everything. I wanted to end the marriage and divorce and—

Q Including support?

A I wasn't into those words in those days, so I didn't know what I was talking about. I only found out later that, you know, that—

Q Well, did you, in fact—

A —There is a big difference in what you agree to and in, you know ...

Q Did you, in fact, in one of these notes acknowledge that she couldn't live on $800 a month?

A I might have. That is pretty—you know, at the time it didn't—now you can—I didn't know I could live on $900 a month. You know, but—

Q Well, you know, I understand that.

A Okay.

Q What I am trying to determine is exactly what you and Kay had on your minds back at the time you were discussing and negotiating your settlement agreement.

A Well, it wasn't nothing rational.

.    .    .    .    .

Q Were you advised by your attorney that she was likely to receive an award of maintenance if you ended up going to trial?

A I kept asking how much—in fact—no, I asked her lawyer. Two different lawyers. And I said, how much do you think the Court will give? And, you know, let's settle it.

And she said, I am not going to represent you.

And then when we get into court she said, we have about—we have almost got an agreement.

Q So the thing that held up—

A I tried to get the Commissioner to have a hearing and they wouldn't do it.

Q So the thing that held up the divorce was a decision as to how much maintenance Kay should receive?

A No, we got the divorce.

Q Okay. All right. But it was the—

A There never was an orderly discussion based on my income and my assets and how much she needed and how much I needed to live on.

Q Wasn't there all kinds of disclosures, just as there are in all divorces, as to relative assets; wasn't that the document that was produced by you and Kay during the course of that divorce?

A No. We went to a Commissioner to set a date. And, you know, the two lawyers—her lawyer and her couldn't decide.

And then they said, "We have already got an agreement."

And so we went to Court three times on the fact that we already had an agreement. We never had discussion like I am talking about. There were never any facts presented.

Q What was the source—

A Of this is my income, therefore, I should pay so much.

Q What is your understanding throughout that proceeding that you were going to ultimately have to provide support for Kay?

A I guess I was asking how much do I owe. I didn't think of it as support. I was giving the assets for that reason.

Q Okay. But it was just, ultimately it was a question of how much, is your testimony, is what I am getting from what you are saying. You correct me if I am wrong.

A I was willing to give everything.[26]

Thomas Helm's closing remark on the dear price of freedom says it all. Of the intent of these parties it may be said, neither indelicately nor imprecisely, that she wanted to get everything she could out of the marriage, and he wanted to get out of the marriage. Legal characterizations of future economic transfers had little if anything to do with those overriding motivations.

(b) *Effect.* From this point forward in our writing we will assume that everything that has gone before is in error. That is, to reach the second level of a *Calhoun* inquiry, we now assume that the Helms *had* intended to create a support obligation.

The question then becomes: Is the support arrangement *necessary* to ensure that the daily needs of the former spouse are met? A restatement of the question, in the context of this case, provides its own answer. Are payments of $1,000 a month necessary to provide for the daily needs of a former spouse with an estate of $300,000 and income of $30,000 a year? Only by stretching the term "daily needs" to an opulent definition could we answer the question in the affirmative. While it is true that the living standards of the parties should be taken generally into account in maintenance questions, we do not believe it to be the business of the bankruptcy court to force the perpetuation of an artifically grand life style. It is at least in part the deferred cost of such ruinous splendor that brought Thomas Helm to this court.

*Calhoun* recognizes that "[t]he distribution or existence of other property" may make other forms of support payments unnecessary.[27] Dollars are, after all, fungible, no matter what they are called. In this recognition that a dollar specifically allocated nevertheless remains a dollar generally available, Judge Kennedy joins the ranks of economists and judges who have addressed a proposition so fundamental as to have been frequently overlooked.[28]

---

26. *Helm transcript* at 79–81, 84–86, 87–88.

27. *Long v. Calhoun,* 715 F.2d at 1109.

28. *See Goetz, Law and Economics* (West Pub.Co. 1984), who makes the point at pp. 259 et seq. "Money not spent for one purpose becomes available for other purposes." Justice Douglas, dissenting in *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) reprinted in *Goetz, supra,* at p. 270.

Professor (now federal appellate judge) Richard Posner conceptually views alimony as a form of severance pay. Thus seen in the overall context of this case, the "severance pay" awarded to Kay Helm, net from all sources, is ample indeed, particularly considering the subsequent insolvency of the terminating "employer." *See Posner, Economic Analysis of Law* (Little, Brown & Co. 1977), at pp. 108–111.

We are compelled to the view that the lump sum settlement to Kay Helm was sufficiently generous, particularly in its potential for income yield,[29] as to make unnecessary any additional monthly stipend.

(c) *Amount.* It is at this, the third level of inquiry under *Calhoun,* that the Sixth Circuit most clearly establishes the dominance of federal bankruptcy policy over traditional state law concepts of support. Bankruptcy courts are directed to measure the level of support payments against the notion of a "fresh start" that undergirds bankruptcy law, and to strike down as inconsistent with the federal scheme any amount of support so excessive as to be "manifestly unreasonable." We are charged to consider not only the debtor's ability to pay at the time the support obligation was created, but his *"current* general ability to pay insofar as it relates to the *continuing* obligation."[30]

It takes no boldness to decide that it is manifestly unreasonable to require a debtor making less than $10,000 a year [31] to pay $12,000 a year in support. We so hold.

(d) *Apportionment.* The fourth and final *Calhoun* inquiry forces a quantum determination—the establishment of "a reasonable limit on the dischargeability of that obligation for purposes of bankruptcy." This exercise is expressly intended to be a limited one, to prevent bankruptcy courts from becoming "super-divorce" courts.[32]

We eagerly accept the limitation, for we suspect that it is here, if at all, that *Calhoun* stretches beyond the clear boundaries of the controlling federal statute, 11 U.S.C. § 523(a)(5). That section, it must be noted, draws no dischargeability distinctions between "reasonable" and "unreasonable" support; either an obligation is for

support, and therefore nondischargeable, or it is not.

Given the conceptual framework of *Calhoun,* and particularly the grant of power to bankruptcy courts to make quantum apportionments, it was inevitable that this tension with the statute would result. Fortunately our holding in the *Helm* case will not contribute to that tension. We need draw no bright yellow line between reasonable and unreasonable amounts of support. We have held, and here repeat, that no part of the $1,000 monthly payments required of Thomas Helm can reasonably be treated as support for the purposes of federal bankruptcy law.

\*   \*   \*   \*   \*   \*

Out of deference to the Sixth Circuit's most provocative and far-reaching bankruptcy decision in recent years, and to summarize this Court's perception of *Long v. Calhoun* as it applies to this and similar cases, some final reflections are appropriate.

The *Calhoun* doctrine signals a significant involvement of bankruptcy courts in domestic relations matters heretofore thought to fall within the sole province of the state courts. Any resulting erosion of federalism, however, is more apparent than real and may be easily explained. It is *not* those questions of support which have been fully litigated and adjudicated in the state court system which are now subject to second-guessing by bankruptcy judges sitting as "super-divorce courts." It is only those cases, *Calhoun* firmly points out, in which former spouses settle their support differences by private agreement (albeit with resulting state court approval), that bankruptcy courts may later reopen and reexamine. In this regard *Calhoun* balances

---

**29.** *See* text following note 4, *supra.*

**30.** *Long v. Calhoun,* 715 F.2d at 1110 n. 11. (Emphasis original). Footnote 11 makes our inquiry into current financial ability a permissive one, but in this writer's view a bankruptcy court would be remiss in *not* considering the remarkably changed circumstances worked by bankruptcy. In many cases the debtor's ability to pay support will have been enhanced by the discharge of other burdensome debts. In oth-

ers, including the present case, the debtor's overall ability to pay will have remained the same or diminished since the time the support obligation arose.

**31.** We use the net income figure of $9,227 for 1984; see note 5 *supra.*

**32.** *Long v. Calhoun,* 715 F.2d at 1110 no. 12.

the federal right to a fresh start against the state interest in judicial efficiency, and finds the latter wanting.

Not that the number of such cases is insignificant; of the 20,531 divorce decrees entered in Kentucky in 1984, 86 percent, or 17,862, were uncontested. A scant 2,669 cases were decided by courts in the adversarial mode.[33] Only the smaller number of contested cases would be insulated from review upon the subsequent bankruptcy of a contributing spouse. To the divorce practitioner interested in judicial finality, the message is clear; litigate the support question at the outset if there is a possibility of insolvency,[34] or be forced to do so later in a forum in which "fresh start" is a guiding principle.

We point out these broad implications of the *Calhoun* doctrine because gauging from the following it has already developed,[35] the opinion may be expected to generate a dramatic growth in the caseload of this and other bankruptcy courts.

*Helm v. Helm* is unique only in that it establishes the outer limits of bankruptcy court departure from the earlier state court treatment of support issues. In the Helm matter we have given content to the *Calhoun* requirements of a current review of unlitigated differences and a commonsense economic approach to what otherwise would be strictly a legal problem, all for the furtherance of the fresh start concept in bankruptcy.

\*     \*     \*     \*     \*     \*

For the reasons expressed above, the obligation of Thomas Helm to Kay Helm for $1,000 monthly payments is hereby declared to be dischargeable in bankruptcy.

## APPENDIX

Cases citing *Calhoun:*

1. *In re Troup,* 730 F.2d 464 (6th Cir. 1984).
2. *Matter of Jenkins,* 32 B.R. 978 (Bkrtcy.S.D.Ohio 1983).
3. *In re Presler,* 34 B.R. 895 (Bkrtcy. M.D.Tenn.1983).
4. *In re Cowley,* 35 B.R. 520 (Bkrtcy. D.Kan.1983).
5. *Matter of Chambers,* 36 B.R. 42 (Bkrtcy.W.D.Wis.1984).
6. *In re Perkins,* 36 B.R. 618 (Bkrtcy. M.D.Tenn.1983).
7. *In re Balthazor,* 36 B.R. 656 (Bkrtcy.E.D.Wis.1984).
8. *In re Migliarese,* 38 B.R. 978 (Bkrtcy.E.D.N.Y.1984).
9. *In re Shumate,* 39 B.R. 808 (Bkrtcy.E.D.Tenn.1984).
10. *In re Boyd-Leopard,* 40 B.R. 651 (Bkrtcy.D.S.C.1984).
11. *In re Kagan,* 42 B.R. 563 (Bkrtcy. N.D.Ill.1984).
12. *In re Rhodes,* 44 B.R. 79 (Bkrtcy.D. N.M.1984).
13. *In re Tressler,* 44 B.R. 786 (Bkrtcy. S.D.Cal.1984).
14. *In re Neier,* 45 B.R. 740 (Bkrtcy.N. D.Ohio 1985).
15. *In re Brandstadt,* 45 B.R. 538 (Bkrtcy.N.D.Ohio 1984).

Cases citing *Calhoun* and applying some portion of its Section 523(a)(5) dischargeability analysis.

1. *Matter of Gerdes,* 33 B.R. 860 (Bkrtcy.S.D.Ohio 1983).
2. *In re Miller,* 36 B.R. 403 (Bkrtcy.N. D.Ohio 1984).
3. *In re Cleaver,* 36 B.R. 516 (Bkrtcy. W.D.Ky.1983) (J. Wm. Brown).
4. *Matter of Wesley,* 36 B.R. 526 (Bkrtcy.S.D.Ohio 1983).
5. *In re Brown,* 37 B.R. 295 (Bkrtcy. W.D.Ky.1983) (J. Wm. Brown).

**33.** Figures supplied by the Administrative Office of Courts, Commonwealth of Kentucky.

**34.** As a practical matter insolvency is always a possibility. According to a survey of the examinations conducted at first meetings of creditors, fully a third of the bankruptcies to come before this court are caused by divorce.

**35.** A complete list of cases citing *Long v. Calhoun,* virtually all of them favorably, appears as an appendix to this opinion.

6. *In re Plaugher,* 37 B.R. 760 (Bkrtcy.N.D.Ohio 1984).

7. *In re Lelak,* 38 B.R. 164 (Bkrtcy.S. D.Ohio 1984).

8. *In re Altavilla,* 40 B.R. 938 (Bkrtcy. D.Mass.1984).

9. *In re Holt,* 40 B.R. 1009 (S.D.Ga. 1984).

10. *In re Bedingfield,* 42 B.R. 641 (S.D. Ga.1983).

11. *In re Yeates,* 44 B.R. 575 (D.Utah 1984).

12. *In re Elder,* 48 B.R. 414 (Bkrtcy. W.D.Ky.1985) (J. Wm. Brown).

13. *In the Matter of Seta,* 45 B.R. 8 (Bkrtcy.S.D.Ohio 1984).

Cases rejecting or critical of *Calhoun:*

1. *In re Lewis,* 39 B.R. 842 (Bkrtcy.W. D.N.Y.1984).

2. *Matter of Quinn,* 44 B.R. 622 (Bkrtcy.W.D.Mo.1984).

3. *In re Brown,* 46 B.R. 612, 12 B.C.D. 869 (Bkrtcy.S.D.Ohio 1985). (Court abstained from reducing alimony payments under present circumstances test of *Calhoun* due to impact of 1984 Bankruptcy Amendments and Federal Judgeship Act).